UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Timberland Transportation, Inc.,                    Civil No. 09-2845 (JRT/FLN)
*d/b/a Priority Courier Experts,*

         Plaintiff,

    v.                                              **ORDER & REPORT AND
                                                 RECOMMENDATION**

Jeffrey A. Nelson and
Master Transfer Co., Inc.,

         Defendants.
_____

John J. Wackman for Plaintiff.
Arthur G. Boylan & Joel E. Abrahamson for Defendant Master Transfer Co., Inc.
Jeffrey A. Nelson, *Pro Se* Defendant.
_____

**THIS MATTER** came before the undersigned United States Magistrate Judge on August

27, 2010 on Plaintiff's Motion for Summary Judgment Against Defendant Jeffrey A. Nelson (ECF

No. 106) and Plaintiff's Motion to Strike (ECF No. 138). The matter was referred to the undersigned

for Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1.  For the reasons

which follow, this Court recommends the motion for summary judgment be **DENIED**.

## I.    BACKGROUND

Priority Courier Experts ("Priority" or "Plaintiff") provides same-day delivery services in

the form of courier and local cartage transportation. To maintain its customer relationships, Priority

assigns  an account manager to each of its account. (Wackman Aff., Ex. 1 ¶ 5, ECF No. 113.)

Account managers have access to confidential Priority information such as key contacts for each

customer, shipping routes, vehicle preferences, annual sales volumes and fees charged by Priority.

1

(*Id.* ¶ 6.) Priority claims that, in order to protect the goodwill fostered by its customers and its confidential information, it requires its employees to sign a Non-Disclosure/Non-Compete Agreement as a condition of employment. (*Id.* ¶ 7.)

Priority hired Jeffrey A. Nelson ("Nelson") as an account manager in the summer of 2004. (*Id.* ¶ 9; Nelson Aff. ¶ 1, ECF No. 137.) Nelson claims that he negotiated the terms of his employment with Ted Burchell of Priority in early June of 2004, at which time there was "no mention that the offer was contingent upon signing of a non-compete/non-disclosure agreement." (Nelson Aff. ¶ 1.) On July 12, 2004 (his first day of work with Priority), Nelson signed a "Non-Disclosure/Non-Compete Agreement." (*Id.*) The agreement provides, in part:

**B. COVENANT NOT TO COMPETE AND NON-INTERFERENCE**.
1. Employee agrees that during Employee's employment, and for a period of one year from and after the termination of Employee's employment with Employer for any reason, voluntary or involuntary, Employee will not, except as required by Employee's employment with Employer, directly or indirectly, alone or on behalf of any business entity, or in any other capacity, or acting as an individual corporation or other entity, in Anoka, Carver, Dakota, Hennepin, Ramsey and Scott counties, Minnesota or other counties or geographic areas in which Employer now or hereinafter conducts business, call upon, solicit, sell, divert, take away, deliver to, accept business or orders, or otherwise deal with Employer's Customers with whom Employee, in the one year period prior to Employee's termination, has dealt or with respect to whom Employee has had access to customer information, nor shall Employee, in any capacity, assist others to do so.
2. Employee further agrees that during Employee's employment, and for a period of one year from and after the termination of Employee's employment with Employer for any reason, voluntary or involuntary, Employee will not directly or indirectly, alone or on behalf of any business entity, or in any other capacity, or acting as an individual corporation or other entity own, manage, operate, join, control, participate in or become interested in or be connected with (as an employee, independent contractor, consultant, partner, officer, director, stockholder/investor, agent or representative) a business or operation engaged in the same or a similar business to that of Employer's businesses in Anoka, Carver, Dakota, Hennepin, Ramsey and Scott counties, Minnesota.
3. Employee further agrees that for a period of one year from and after the termination of Employee's employment with Employer for any reason, voluntary or involuntary, employee will not endeavor to, attempt to, or actually, directly or

indirectly. Induce [sic], solicit, encourage, or attempt to hire or engage any employee of Employer (pr [sic] any former employee who was an employee of Employer within one year of the date of Employee's termination of employment) to become employed by any person, firm, corporation, business enterprise, entity or business organization, with which Employee may become associated, affiliated or connected.

**C. NON-DISCLOSURE.**

1. "Confidential and/or proprietary business information of Employer" means information, not generally known and proprietary to Employer or of a third party who has entrusted such information to Employer and includes, but is not limited to, customer account information, rates, pricing methods and schedules, sales data, financial information, business and marketing plans, customer lists, business contacts, fee schedules, personnel information and policies, any documents labeled or stamped "confidential," or any documents kept in confidential and/or locked filing cabinets. All information disclosed to Employee, or to which Employee has access, whether originated by Employee or by others during Employee's period of employment, which Employee has a reasonable basis to believe, is "confidential or proprietary business information of Employer."

**Further, Employee agrees that if Employee has any doubt as to whether information is "confidential and/or proprietary business information of Employer," Employee will treat the information as such unless and until Employer indicates that the information is not "confidential or proprietary information of Employer."**

2. Employee agrees that Employee will not, during Employee's employment with Employer or thereafter, use, publish, otherwise disclose or utilize in any way, any confidential and/or proprietary business information of Employer, or as directed by Employer.

(Wackman Aff., Ex. 1, Ex. A at 2–3 (emphasis in original).)

During his time with Priority, Nelson was given access, not only to confidential information about the customers whom he serviced, but also access to key data about all Priority customers. (Wackman Aff., Ex. 1 ¶ 10.) Nelson knew the annual and monthly sales volumes, the key contact person, the typical routes used as well as vehicle preferences and pricing data for each of Priority's customers. (*Id.*) Priority maintains that no other sales representative or account manager had access to this level and breadth of information. (*Id.*) Nelson also had the ability to retrieve each customer's login identification number and password for the Priority database. (*Id.*)

On or about June 1, 2008, Nelson resigned from Priority. (*Id.* ¶ 15.) Nelson told Priority that

he had an opportunity to hold an equity position at another company. (*Id.*) Shortly thereafter, Priority learned that Nelson had gone to work for Master Transfer Co., Inc. ("Master Transfer"), which was in the business of providing regional truckload transportation services. (*Id.*) Master Transfer did not offer courier or local cartage services at that time and was not a competitor of Priority in June 2008. (*Id.*) Sometime in the fall of 2008, Master Transfer began competing with Priority by offering same-day courier services. (*Id.* ¶ 16.)

According to Priority, Nelson shared information contained within a chart of Priority's customers with Master Transfer employees. (Wackman Aff., Ex. 2 ¶¶ 6, 9.) The chart contained account names, addresses, and contact information for the person responsible for hiring carriers. (*Id.* ¶ 6.) Nelson also related, to at least one Master Transfer employee, the volume of shipping done by each Priority customer so that the employee could assess the potential profitability of each account. (*Id.*)

Priority also alleges that Nelson logged into Priority's database of customer accounts from Master Transfer's IP address (Wackman Aff, Ex. 1 ¶ 19) and that, before his departure from Priority, Nelson e-mailed several confidential documents to his home e-mail account, including Priority's entire customer list. (*Id.* ¶ 18.) The customer list contained the identity, location and annual and monthly sales volumes of each customer. (*Id.* ¶ 12.)

On October 13, 2009, Priority filed suit against Nelson and Master Transfer, asserting a number of counts, including breach of contract against Nelson. (Compl. ¶¶ 46–51.) Priority now moves for summary judgment on its breach of contract claim against Nelson. Priority claims that Nelson's violations of the "Non-Disclosure/Non-Compete Agreement" entitle it to $50,000 in liquidated damages pursuant to the terms of the contract.

## II.   LEGAL ANALYSIS

### A.   Summary Judgment Standard

According to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  In order to determine whether a certain fact is material, "it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment will not be granted "if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "The inquiry performed is the threshold inquiry of determining whether . . . there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250.

When determining whether to grant a motion for summary judgment, a court must view all of the facts in the light most favorable to the non-moving party and give the non-moving party the benefit of all reasonable inferences that can be drawn from those facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).  When the moving party brings forth a proper summary judgment motion, the "adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see Anderson*, 477 U.S. at 256 ("[A] party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth

specific facts showing that there is a genuine issue for trial.”); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (“Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c).”)

  **B.**   **Because genuine issues of material fact exist as to whether the non-compete agreement was supported by adequate consideration, summary judgment is inappropriate.**

  Priority argues that the non-competition agreement was a condition of Nelson's employment and is valid as such.

  Covenants not to compete are generally disfavored as partial restraints on trade. *See Drummond American v. Share Corp.*, 2010 WL 3167326 at *6 (D. Minn. July 23, 2010); *Kallock v. Medtronic, Inc.*, 573 N.W.2d 356, 361 (1998); *Nat'l Recruiters, Inc. v. Cashman,* 323 N.W.2d 736, 740 (Minn. 1982). Generally, a non-compete agreement is “invalid unless bargained for and supported by adequate consideration.” *Sanborn Mfg. Co. v. Currie*, 500 N.W.2d 161, 164 (Minn. Ct. App. 1993). If the covenant is not “ancillary to the initial oral employment contract, it can be sustained only if supported by independent consideration.” *Cashman*, 323 N.W.2d 736 at 740.

  Priority asserts that, because the agreement was entered into at the inception of employment, it is supported by adequate consideration. *See Freeman v. Duluth Clinic*, 334 N.W.2d 626, 640 (Minn. 1983). Priority claims that Ted Burchell discussed with Nelson the need to sign the non-compete agreement during pre-employment interviews. (Second Burchell Aff. ¶ 2, ECF No. 133.) Priority further contends that, as a benefit of the agreement, Nelson was handsomely rewarded and entrusted with information and responsibility he never would have been given if he had not signed the agreement.

  Meanwhile, Nelson argues that the non-compete agreement is unenforceable because there

was no valid consideration for the contract. Nelson states, in his affidavit, that the terms of his employment with Priority were negotiated in early June of 2004 with no mention that the offer of employment was contingent upon Nelson's signing a non-compete/non-disclosure agreement. (Nelson Aff. ¶ 1.) He claims that only when he reported for his first day on July 12, 2004 was he informed that he "would need to sign" the agreement "if he wanted to work for Priority." (*See id.*)

"Courts in this District have concluded, on a number of occasions, that the failure to disclose the noncompetition agreement prior to the employee's acceptance of an employment offer, is a primary consideration in determining whether independent consideration is required." *Drummond American,* 2010 WL 3167326 at *8; *see Timm & Assoc., Inc. v. Broad (Timm II),* 2006 WL 3759753 at *2 (D. Minn. Dec. 21, 2006) (concluding that, because the parties presented contradictory evidence as to whether the employee received the noncompetition agreement before or after he accepted the offer of employment, genuine issues of material fact remained); *Universal Hospital Services, Inc. v. Henderson,* 2002 WL 1023147 at *3 (D. Minn. May 20, 2002) ("[The plaintiff] has the burden of proving that the Agreement was valid; at this stage, it has not met its burden because it has not refuted [the defendant's] assertion that he accepted the employment offer before [the plaintiff] asked him to sign the Agreement."); *Cannon Services, Inc. v. Culhane,* 2004 WL 950414 at *3 (D. Minn. Apr. 30, 2004) (concluding that the "circumstances present a classic dispute of material fact," where the defendant asserted that no one ever mentioned the noncompetition agreement prior to his accepting the offer, and where the plaintiff asserted that it had reminded the defendant repeatedly that he would be required to sign such an agreement); *see also Cashman,* 323 N.W.2d at 741 ("The practice of not telling prospective employees all of the conditions of employment until after the employees have accepted the job . . . takes undue advantage of the

inequality between the parties.")

As the plaintiff and the moving party here, it is Priority that must proffer evidence in support of the validity of the agreement. Notably, Priority has not provided any uncontroverted evidence that demonstrates that it advised Nelson that he would be required to sign a non-competition contract prior to his acceptance of the employment offer. *See Drummond American*, 2010 WL 3167326 at * 9. Priority has failed to establish that the non-compete agreement was ancillary to the initial employment agreement. *See id.* As a consequence, this Court concludes that genuine issues of material fact remain.

Because Priority has not demonstrated that the non-compete agreement is enforceable as a matter of law, it is not entitled to summary judgment on its breach of contract claim against Nelson. *See id.* at *11. There is a genuine dispute as to whether the non-compete agreement was a known condition of employment before Nelson accepted Ted Burchell's offer. Viewing the evidence in the light most favorable to Nelson, this Court concludes that Priority has not established that it informed Nelson that he would be required to sign a non-competition agreement before he accepted Priority's offer of employment. *See id.* at *9. Therefore, this Court finds there to be genuine issues of material fact with respect to the issue of consideration, and accordingly, the ultimate enforceability of the non-compete agreement. *See id.* The motion for summary judgment must be denied.

### III.    RECOMMENDATION

Based upon the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED** that Plaintiff's Motion for Summary Judgment Against Defendant Jeffrey A. Nelson (ECF No. 106) be **DENIED**.

### IV.    ORDER

Based upon all the files, records and proceedings herein, **IT IS HEREBY ORDERED** that

Plaintiff's Motion to Strike (ECF No. 138) is **DENIED**.


DATED: October 20, 2010     <u>*s/ Franklin L. Noel*   </u>
             FRANKLIN L. NOEL
             United States Magistrate Judge


Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before **November 4, 2010**, written objections which specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within fourteen (14) days after service thereof. All briefs filed under the rules shall be limited to 3,500 words. A judge shall make a de novo determination of those portions to which objection is made.

Unless the parties are prepared to stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and cause to be filed by **November 4, 2010,** a complete transcript of the hearing.

This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.